This case is on the docket 2-14-1201, Kindu v. Zeta v. Illinois High School Association We are arguing on behalf of the Avalon, Attorney David Breslau. We are arguing on behalf of the Avaline, Attorney John F. Hayden. Good morning. Mr. Breslau, are you ready? May it please the court, counsel, Mr. McKindu. As the court is aware, this is an appeal of a preliminary injunction entered by the Kean County Circuit Court back in early December. As a result of the entry of the preliminary injunction, the plaintiff was enabled to participate in basketball as a member of the Mooseheart basketball team for the entire 2014-2015 season, despite being ineligible under the bylaws of the Illinois High School Association. And they lost in the first round of the playoffs, right? No, the second. But good. He remains eligible for any other interscholastic competition under the preliminary injunction until his graduation. So if he wanted to participate in track or something like that, he is still eligible to participate under the preliminary injunction. Soccer was his preference, but there's no soccer at Mooseheart. That's my understanding, Your Honor. Can I ask you a question just briefly? Certainly. Just for my adaptation. Do all students reside on campus at Mooseheart? It's my understanding they do. Yes. Yes, he still has eligibility, and that's why this, at least for one reason, has not moved correctly. Through his graduation, that's correct, Your Honor. And the graduation is this May? That's my understanding, yes. In this instance, the standard of review is de novo because this court is being asked to construe a pure question of law. The question of law arises out of the construction of a contract, that contract being the IHSA bylaws, which have been construed to be a contract between the associate or among the member schools, and construction of a contract is a question of law. Did the trial court find this to be potentially unconstitutional as applied? It did, Your Honor, but... As applied to the facts of this case? Well, yeah, I want to get into whether the court actually undertook an analysis of the facts of this case, but I think that what the trial court said is a term of the contract was ambiguous, that being what's the definition of an international student? Ambiguities in a contract are construction of a contract, which is construed de novo as part of the construction of the contract. That is really the linchpin of the court's opinion as I read it, and I'll get into why as I proceed, Your Honor. But the issue is was a fair question presented, and the finding of was a fair question presented, wouldn't that be reviewed for an abuse of discretion? I think that the question of whether a fair question was presented is itself a question of law because the problem with the trial court's opinion here was he threw out the fact that in his opinion, there was a fair question of whether the definition of international student, which, by the way, no party ever argued, presented a fair question. He then didn't take that next step of saying, well, as to that fair question, is there a likelihood of success on the merits? He just let it hang out there. And I would suggest, Your Honor, first of all, that the determination of whether a fair question exists on the definition of international student, really it's a red herring. First of all, it's a commonly used term. It was never disputed in this case, and there's no dispute that he is an international student. Additionally, if you look at the use of the term international student within the context of the bylaws, it comes up in the residency section, and it's a very specific residency section. So when you look at all of the circumstances, again, in the contract, not the outside facts, that was a red herring. He compounded the red herring by then saying, well, how many students are affected by this? And, again, that's really a non sequitur to the analysis or lack of analysis on the issue of whether there's a likelihood of success on the merits. Well, that, I perceive that his question about how many students and or more particularly schools are impacted by this as a level of scrutiny that he was looking at. If there are only three students impacted by this or seven students, and they all happen to be at a certain school, that could be difficult to overcome, don't you think? Your Honor, I don't look at it that way because whether it's one student or a thousand students, it's all about level and competition. What you're asking about is are we going to take a case-by-case review, and obviously the bylaws don't allow for that. The bylaws are democratically chosen bylaws. If that's the issue, why does your brief keep talking about Mooseheart's trying to create a dynasty, Mooseheart's doing this, Mooseheart's doing that? Why is that an issue if you're saying it's not an issue? You're raising it on at least three different pages in your brief. You're right about that, Your Honor, because the Mooseheart situation is an example of the necessity for the bylaw, okay? But they're the only ones that Mr. Hickman could identify. He said maybe 125 students, but he didn't know where. But, Your Honor, whether one person gets shot by a gun or 100 people get shot by a gun, the gun's still dangerous, okay? Well, it is an apt analogy because you still have the potential, which has been recognized by the Illinois High School Association as well as the National Federation, all of the organizations which study this, which say we've got an influx of kids attending under these other visa programs who can directly be placed into schools. Now, the Mooseheart situation is here's what happens when that goes wrong. Here's why this rule is necessary, because you can have somebody who says, hey, Mooseheart's willing to take seven-footers from another country, and in addition to letting them go to school there, they're not only going to house them, they're going to pay their tuition there, they're going to even give them college scholarships. Maybe it's because they have a specific disadvantage. They may have an advantage, but they may also have a disadvantage. And you have to weigh that relative to the legitimate interests of the IHSA, which the Seventh Circuit recognized in Griffin, to level the playing field. Let me ask you this then. They amended the 3.0343, the bylaws. In amending the bylaws, they basically allow somebody who's on a J-1 visa to play, but if somebody's on an F-1 visa, they're... No, Your Honor. Let me explain how it works. The way that the bylaws work is if a student is placed through CSIET, which is the Council for International Exchange Students, and there's no undue influence, for lack of a better term, for school selection, it doesn't matter whether they're under a J-1 or an F-1 visa. They can come in under either one if they come through CSIET. I'm sorry, Your Honor. But didn't CSIET just start looking at F-1s in the last two years? Last two years, that's right, which the bylaws amended a year ago. But this is not something that has been going on forever. Historically... They stayed away from F-1s. That's correct. But you have to understand, again, the distinction between the F-1 and the J-1 visas. I understand it, but it's not something we can control. But it is federal law. It's not something we can control either. We have to follow federal law, which says if you come here on an F-1 visa, you have to pay your own tuition, and you can only attend a public school for one year. You can attend a private school for the entire duration of your education. It's not even limited to high school career. And you don't have to pay your own tuition. So all this bylaw does is try to say, hey, we've got private schools. And, again, I will acknowledge, Your Honor, Moose Heart is a little unique because they offer residency and tuition. But we've got private schools who can basically attract students from around the world versus a public school that's limited to their little district. Now, as a practical matter, a private school, probably most of them don't have the ability to pay tuition and house students. But theoretically, a student under an F-1 visa could attend a public private school who could never attend a public school in the United States. But Moose Heart didn't do this recently. This is an over 100-year-old, or it's a very old concept. It just – I mean, the Moose – it's part of the Moose organization, the Loyal Order of the Moose. It was set up for that purpose. And it's been housing orphaned, poor, and disadvantaged children for a very long time. It has been, Your Honor. But the issue of drawing students from other countries – I mean, remember the history of the dispute, which Judge Aikman discusses in his order, goes back to the situation with an organization called AHOPE, African Group Opportunities in Education. That's an organization set up to recruit students from Africa to place them in the United States to play basketball and get an education. If you go to their website, they boast about how many students are playing basketball at high levels. Mr. McKinley didn't come through AHOPE. He did not, but you were asking for the perspective on this. So the situation came to light at Mooseheart a couple of years ago when a student who was at a prep school in Kansas or somebody closed, and AHOPE made calls and says, hey, we got this basketball player. Can you take him? Mooseheart took him. He was not eligible to play. They then said, well, if you're willing to take him, we have three more basketball players. They took them. They ultimately won the state championship. Now, I will acknowledge Mr. McKinley did not come through that as far as we know. But you said, does it go back 100 years? And I don't believe it does. Well, the organization does, how it's been operating recently. But the fact that they gave Mr. McKinley tuition, free board, and a scholarship is nothing new in that particular organization. And they would be free to do all of that. The question becomes, now you're putting, you know, you're opening the door to say, hey, here's a basketball player. Mooseheart, will you take him? And, I mean, that's what happened in the past. That's what this bylaw is addressed to. Are you concerned that Mr. Schmidt is brokering things here? I mean, I read the testimony. He got some information. He's tried to guardian this child or this young man, but apparently he's just not able to because he has four or five of his own children. Well, that was a choice that he made. To have four or five children is a loss. No, no, no, no, no. You said to broker the young man. Well, that's what it sounds like you're accusing him of. And I think he just got an email and responded. He got an email and responded, but it's very interesting that he highlighted McKendoo's basketball abilities when going to other schools. Now, is that the reason that they selected him? No, but it certainly gives me concern if I'm an athletic director in school and I'm getting emails saying, hey, I've got a great basketball player. Can you take him in? And why am I concerned about that? Because the public schools don't enjoy that opportunity. They can't do it. They can't do it because they're districted. They can't do it under federal immigration law. By the way, does the Congo have a recognized student exchange program that Mr. McKendoo could have participated in? He could have participated in CSIET because that takes from around the world. But then he'd have to live with a host family and not in Mooseheart, correct? If he was placed in Mooseheart through CSIET, I mean, that exception would have been appropriate because that's what the rule says. But anybody who goes to Mooseheart has to live there. It is my understanding, but I'm not 100 percent sure about that. Well, that was the first question I asked you out of the box. Yeah, I believe that is the case. I believe that is the case. So they wouldn't have been able to go in through? Well, CSIET placed the student at Mooseheart. And again, we're kind of getting into hypotheticals here because it's never happened. It would be my understanding he would be eligible, but, Your Honor, again, that's kind of three steps down the road. The bylaws, in effect, before they changed, weren't international students treated the same as pretty much any other student who may have come from a different state or something like that? Actually, there was an exception created for yes and no. They were, except there was an exception which allowed immediate eligibility if they came through a program like CSIET. Remember, what we're talking here is not about the general bylaws. I mean, if an international student, I mean, let's get back to what we're talking about. We're talking about equal protection and an allegation that there's been discrimination based on alien status. But if somebody is an alien and they're here living with a guardian, they're here living with their family, they have eligibility. They're treated just like everyone else. So what we're talking about is an exception here which allowed immediate eligibility which wouldn't exist for any other student. Well, a J-1 student could only stay for a year. Might be able to re-up, but was technically only here for a year. So that exception made sense. Yes, I agree. And not many of them did re-up, did they? I don't think that they could under the law because by the J-1 visa they're only allowed to stay here a year. So this wasn't a magnanimous exception. It was a reality exception. Your Honor, I appreciate your characterization of that. But this whole thing started because, you know, 30 years ago because you did have foreign students who came here and played not under a CSIET-type program and, again, had success and said, well, wait a minute. How did you get there? Why did you pick that school? So there has to be some control to avoid the situation which, unfortunately, came true in New York. Was this system in effect when one of the most famous came, Mr. Blau from Germany? Was this placement system in effect then? I don't know. Did he play in Illinois? He played in Effingham. He went to Effingham. He may have been the test case, Your Honor. He may have been. I don't know, Your Honor. You stumped me on trivia. What can I tell you? I'm not a basketball fan. Interesting. With respect to the hearing that was held, the defendant or the plaintiff didn't have to show his right to equal protection. It was violated. Didn't he only have to raise a fair question? That's okay. That's our signal. Yes. He has to raise a fair question, but the case that I cited, and I don't know off the top of my head, says each of the elements of a preliminary injunction has to be shown by a preponderance. So, you know, a fair question isn't just pulling, hey, I've got a question. It's got to be a reasonable question, a strong question, a realistic question. But fair means you have to undertake some analysis of what is the likelihood of success on the merits, and Judge Aikman didn't do that here. He just threw out a fair question and went no further. He did say in his order that there was nothing in the record that he saw to show that an international student would necessarily negatively affect competition by his or her participation. So, I mean, the trial court didn't completely just render a decision without analyzing some of the facts here. I mean, the trial court looked at this, looked at the evidence that was presented, and decided that there was nothing presented to it that showed that this would negatively affect competition. And, Your Honor, I would suggest that that absolutely ignores the evidence which says that if a private school can gather students from around the world, whereas a public school, a boundary school, can only get kids from their district, that would have a negative effect on competition. I think what the court was saying is, well, the fact that he's international in and of itself doesn't make him a better player. That's irrelevant. Well, the fact that that issue is the rational basis, if it is under that standard and not strict scrutiny, for the amendment to the bylaws that may disadvantage alien students over other students, and whether or not there's some other basis, some other, you already have a rule against recruiting. Why wouldn't that apply here? I mean, if you have a school that is recruiting students to play basketball, I mean, why couldn't you pass another one about, or maybe you have something, about students themselves or someone on their behalf marketing students for the simple aspect of playing basketball? What we're getting at is you're lumping every international student together, and that's the 7-foot star basketball player along with the 5'4", very unathletic kid that comes over that may want to just participate in bowling to get involved in something. Absolutely correct, Your Honor, because this is a blind analysis. It's no different from the transfer bylaws that say you have to sit out a year after transfer or the residency because— But it's a rational, you've got to have a rational basis. You have a problem that you see. I see this problem, and now we're going to fix it with this rule, and this rule has a rational basis to fix the problem. But if you're lumping everybody together in the whole pot, how are you fixing this problem by dumping in the poor kid that wants to bowl on the team? The rational basis is the distinction between the private schools and the public schools that the Seventh Circuit recognized in Griffin and said that the IHSA has a legitimate interest in figuring out ways to equalize that competition. That's the rational basis, Your Honor. But doesn't the changing of the bylaw really affect only the poor immigrant? I'm sorry, Your Honor? It affects the poor immigrant students. I don't want to say it affects only the African or black students, but it kind of does. But it affects people basically coming under F-1 visas, which are typically people that are poor coming from, you know, a rougher area. So by doing what you're saying to Justice Burke, you're kind of lumping all of those people together. So isn't that violating their equal potential? Well, first of all, it's not all F-1 because conceptually somebody could come over on an F-1 visa. I mean, McKendoo, Mr. McKendoo, could have had a guardian appointed and would have then been eligible because the rules say in addition to this exception, if he meets the other eligibility bylaws, he can gain eligibility that way. Again, there's another way. Remember, we're talking about what was intended originally as a narrow exception to those eligibility bylaws. But if he meets the other eligibility bylaws, he's on the same – he's considered exactly the same as any other student. But it would be for only one year, correct? Well, it would be for only one year because of federal law. But it wouldn't be under – no, it would not actually be if he was at a private – if he was at a private school, had a guardian or was living with his parents under an F-1 visa, he would be eligible just like a U.S. citizen born and raised in Illinois. Well, and you kind of can't blame the wife of the director at Plano High School when she said, I'm not taking this kid in my house. I have other kids. I mean, wonder what the need is or the desire for somebody to take a 7-foot tall kid from the Congo into their home. Your Honor, I've been doing IHSA work for over 25 years. You would not believe the scenarios under which people will try to place athletes in schools. No, I understand. And unfortunately, you know, if we could set forth every possibility in the bylaws, believe me, we would. People are creative. Any other questions? No, no. Thank you so much. Thank you. Good morning. And Mr. Hayden, we will tap some time on to your argument. Are you going to argue the whole time? Yes, I am. Okay. So we'll tap some time on. I don't want to give an unfair advantage. Please, the court, counsel. I think it's important for us to remember just a couple of things here. This is an equal protection case. I'm sorry, say that again? This is an equal protection case. There's been a lot of talk about recruiting in this case. The reason for this bylaw is very simple. Little Mooseheart High School had to marry the state basketball championship immediately because they had three foreign kids playing. This bylaw was passed. Prior to this bylaw, prior to this bylaw, one of your honors asked this question. Back in the day, Uwe Blatt played down south. And there were no regulations. And I know that because I played high school football with a Canadian quarterback and a Costa Rican kicker at a boarding school. There was no issue about their eligibility simply because they were foreign kids. Those rules did not exist. We have a problem here because, and I think the gist of this case is similar. It's very simple. If you take a boy from Cleveland who decides he wants to go to school in Illinois. He's in eighth grade and decides there's a boarding school here. There's only a few of them left. He wants to play ball at one of them or he wants to study physics at one of them. And he gets the grades. He takes the entrance tests. He passes. He gets a great score. He gets admitted. He comes to school here. He's got a cousin from another mother in Angola who decides the same thing. He's on the Internet one day and sees this great school in Illinois and says, I want to go there. And he's in eighth grade. And he gets good grades. And he studies hard. He gets the exact same test scores as Bubba from Cleveland got. He comes to the same school under an F1 visa. First day of school, they have a tryout for sports. All the little freshmen come on out for sports. And the coaches look at these two boys, and they're both six feet tall and 180 pounds. Identical, almost identical twins. And they say, Bubba, go get your shoulder pads because you're from Cleveland. You can play. Herman Aguildo, you're from Angola. Oh, I'm sorry, you can't play. The only reason you can't play is because you're from Angola. Let me ask you this, though. The other side argues that this is a discrimination, alleged, if there is any discrimination, alleged discrimination against subgroups of aliens, not against all aliens. Because if any aliens came from out of the country and lived with a guardian, they'd be able to play just like the kid from Cleveland. So is this alleged discrimination between subgroup of aliens or between all aliens? There are two problems with that statement by the state. First of all, people came and lived with a guardian. Mr. Bressler just told you you can't believe the ways people try to circumvent the rules. Can you imagine what would happen if a seven-foot ball player from Angola came here and somebody wanted to be his quote-unquote guardian? There would be an outrage. There would be a war over that. Because you can't just become somebody's guardian because you want to. And with a J-1, you have a guardian. And don't the rules under J-1 say that you can't pick a school? Yes. They kind of place you? That's the gist of it. It has to be a line draw, basically. They place you randomly. So, you know, if the kid is on the Internet and they find somebody who wants to take him in, and even if they come in under a J-1, are they going to be able to say, oh, I want to go with these people and they're at this school? If they go through a J-1 type program, no, ma'am, they cannot. They cannot. They cannot. But if you come across on an F-1, you certainly can pick your school. And isn't it the reason that they've kind of come down on these F-1s? Because from reading that in 2007 there were 6,500 F-1 visas, as opposed to 2013 the F-1 visas have grown to 77,000. So isn't it necessary to kind of monitor these? I suppose it's not a bad idea to monitor them, but the problem the IHSA has here, when we asked Dr. Hickman specifically how many foreign students, how many international students are there in the state of Illinois, I don't know. They've marketed this legislation by saying there's an influx. That was their word. An influx of foreign students is going to upset the competitive balance. As one of my colleagues is fond of saying, this is a bylaw looking for a problem. There's not a problem here. They can't tell us how many foreign kids, or give us a single example where the competitive balance has been upset. I thought there was some testimony that there might be as many as 125, but they couldn't be pinpointed to any different location. Wasn't that? No, the numbers are very sketchy. The numbers are very sketchy because I don't think anybody really keeps track of this in great detail. If I get back to Justice Burke's question about the subgroups of aliens, discrimination against a group or part of a group, I would suggest that Brewer, Arizona Dream Act Coalition versus Brewer, is a case that's right on point. That's a case where a group of aliens, who actually have no status, they're not J1, F1, legal, illegal, but the federal government granted them some status because they were essentially brought here as little kids and things. They said, okay, we're going to let these have a special program for these people. The state of Arizona said, fine, we're not going to do driver's licenses. The Ninth Circuit in the U.S. Supreme Court just affirmed or refused to upset the Ninth Circuit's ruling. It said, no, that's just blatant discrimination, even though other aliens Isn't that allowed in Arizona? Oh, I'll decline the opportunity to take up that argument. The Ninth Circuit said very clearly, even though other aliens can get driver's licenses in the state of Arizona, this subgroup can't, so that's discriminatory, quite clearly against this group. It's the exact same thing against the kids that come around under F1s. But they didn't really come to a conclusion of whether that was rational basis or strict scrutiny, though, in that case, did they? No, Brewer said either one. Right, that's kind of like the trial court did here. I'm sorry? Just like the trial court did here. Essentially, yeah. Brewer didn't really address the fair question issue exactly the same way. Federal law is slightly different, but the principle is identical. That case is essentially on all fours. Didn't Brewer have a footnote in it, though, that said something about where you're talking about aliens who are here legally, that that is usually strict scrutiny? Yes. And we believe strict scrutiny should apply here, but we don't fear a rational basis analysis because there's no rational basis for this regulation. The state says we need to, they use the term maintain competitive balance. I take some exception to that term because actually what the IHSC is here to do is provide a forum for fair competition, ensure fair competition. If they really want to maintain competitive balance, they will say, could say theoretically, high school A, you have three 6'3'' girl basketball players. You can only have one because you're too good with three. The other two have to transfer somewhere else. That would maintain competitive balance. That's not their job. Their job is to make sure fair competition occurs. And there's a slight but important difference there. So I take exception to maintaining competitive balance. They can point to no examples in terms of rational basis.  And I think Dr. Ackman hit the nail on the head in his opinion when he talked about fair question. And then he segued to cite Dr. Hickman's testimony that there is absolutely no logic to the notion that an international student will somehow be a good enough athlete to upset the competitive balance. That's a ridiculous assumption. It's an absolutely ridiculous assumption. There's no reason to believe any given international student is going to be a world-class basketball player or sprinter anymore. So then how do they ensure a fair balance or fair competition? How do they ensure that under your standard? Well, as the court pointed out earlier, there are rules against recruiting. Dr. Hickman, how many recruiting violations have you investigated and successfully prosecuted in the last 20 years? I think he said you could think of none. It's not a problem. Are you talking about the international students you're talking about? Any students. Any students. If it is a problem, deal with it through your existing rules, which are reasonable and fair. They would argue they can look ahead and they can be proactive if they see a problem on the horizon before it manifests itself. And they have an example of it, which is the Moose Heart, which I don't know if it ever won a state basketball championship prior to three international students coming on the team. Then they get three international students and then all of a sudden win state class A basketball, which is a pretty big deal. So you have that incident that happened in the past, plus these other states that have apparently seen problems or at least foresee problems. Why can't they be proactive and say we're going to nip this in the bud before anything happens in greater numbers? Because the means they've chosen to be proactive here are blatantly discriminatory and not justified by any fact. Discriminating against whom? Against who? Discriminatory how? Because Herman Aguilo, who comes from Angola under the exact same circumstances as Bubba from Cleveland, can't play and he can't play solely because he's a foreigner. Under the pre-amendment bylaws, they were treated the same, right? I believe yes. Other than the J-1s who normally would have to sit a year and that's the whole year they're here, they were allowed to play their inmate year. And the proof of that, the important part of that is when the bylaw we're challenging was initially proposed, it didn't have the boarding school language in it. And then they added, they added this provision of boarding school exception which allows legitimate boarding students to be treated as legitimate students that they are. They add the language that boarding school exception will not serve to establish residency for these kids. So that's just another layer of just blatant and hideous kind of discrimination. It's horrid. It's horrid. Wasn't Mr. McIndoe sitting out his year when this amendment occurred? He was. When he arrived, the rule was he would have, because he was a sophomore transfer, he wasn't a freshman. Because he was a sophomore transfer, he had to sit out 12 months and then presumably everything else being able, he would be eligible. He had begun that process. He was told when he got, I don't know, famous, he was probably told, you know, we got this new bylaw that may get passed. If it does, you may not be able to play. Well, but the rules under which he arrived here and under which he began his stay would have allowed him to play within 12, at the end of 12 months. Absolutely. Which again is the same rule if he came from Cleveland. Yes. Yes, as a transfer. As a freshman, my belief is you can play immediately. So your argument that this rule disadvantages all aliens to some extent, or at least puts them all in the same category, different from non-aliens. Yes, and the state says, the state will argue that that's not true because the CSIET kids get to play for a year. They talk about this exception that was carved out. What happened was we had situations back in the day like Mr. Bob and a few others where foreign students came to play. Okay, we have to address this. We will allow exchange students. I prefer that term because it defines it better, I think. We'll allow exchange students to play for the one year they're here. We'll give them that tasty American experience, give them that chance, and that's what we'll do. That's what the original bylaw exception was done. I don't think it was to grant them special privileges. It was to allow these kids to have a chance to play for one year. They're only here for one year. Plus, this new bylaw only allows any international student to play for one year, right? Yes. Unless they're with a guardian. Well, unless they're with a guardian, but that's a specious argument because I do not believe the state of law says you can just go get a guardian. You can't do that. If you did, and there was any chance it was for athletic purposes, it would be investigated and I would hope prosecuted because it wouldn't be right. It would be in violation of very reasonable rules if you did that. So this notion you can just go get a guardian, I think, is incorrect and just as serious right now. Well, what if the country that you come from does not have a recognized exchange program? I mean, I asked that question before. Does the Congo have a recognized exchange program? Could Mr. McKinn do have come that way? I mean, I did not see that in the record, and I guess I shouldn't go beyond the record, but hypothetically, if the only way you can get here is by an F-1 because you don't have that exchangeability, does that mean you shouldn't come? Is that the disadvantage that's being created, stay where you are? Of course it doesn't mean you shouldn't come. You should be allowed to come. That's our position. These kids should be allowed to come here and enjoy all the privileges that the federal government has granted them by giving them a visa. You're here legally. Why should they be discriminated against? Why should kids who come to a legitimate, and it's essentially got to be a boarding school, not always necessarily, but almost always, why should kids who come here as legitimate students, they need tuition, they want to get an education, why should they not be allowed to play sports? Didn't Indiana and Kentucky have some restrictions in their association and Ohio? Some states do. Ohio has a strange limitation. You can only have so many foreign kids. It doesn't make a lot of sense. Indiana is, I think, in a state of flux from my research. Kentucky, I think, is one of the states that has a similar ban. I know Arizona has a ban essentially identical to this one. Wisconsin, Iowa, and I think Missouri all have boarding school exceptions, I believe. Which allow them to play. Yes. Most states have a boarding school type exception. I think the state of Connecticut has essentially a separate league for private schools because they have so many of the elite prep schools there. I think they have their own league, and that's just how it is. But I think the majority of states have a boarding school exception. Think about the rationale of that. You get kids who come here, and again, if they're coming for athletic purposes, that's something that the IHSA has rules in place to deal with, and they should deal with it. But if they're coming here to be legitimate students, why should they not be allowed to do that? Why should they be penalized? And the only reason they're being penalized is because they're foreign. That's the heart of this discrimination. Or it's because they're tall. And we're talking basketball players, correct? Well, that's what led to this thing, yes. Because these kids at Moose Heart were big and pretty good and had some success. You're alleging of suspect class not a fundamental right to play basketball, correct? There's no fundamental right to play basketball. And your suspect class is strictly being an alien, being an international student? Alienage, absolutely. Nothing further than that? Alienage is the gist of it, absolutely. Nothing about race, poor? Well, I'm tempted to address the racial issue because I'm not sure why the IHSA has to continue to point out these are African people we're concerned about. Why aren't they concerned about seven-foot-tall kids from Sweden? Why don't they mention that? It's African. And I really take offense at what I believe to be the inherent racism in that context. If you look at it, again, it always gets back to Moose Heart in this case. And the bylaw change, I think we'd all be kidding ourselves if we didn't say it didn't have some genesis, if not the genesis, in the Moose Heart situation. And that's what we have in Moose Heart. If these kids had been seven feet tall from Croatia and they won the Class A state championship, I'm guessing that the IHSA would have reacted the exact same way. The membership of the IHSA absolutely would have reacted the same way because the whole boundary versus non-boundary school, if you want to start a war, get on one of the websites or one of the blogs and just make a comment about that. Oh my goodness, it will light up like crazy. There's, I'll use the word animosity towards the non-boundary schools, great animosity towards them. There was another proposal on the ballot this last one, how their legislative process works. Their last round of ballots to make the private schools compete in their own, outside their state. That didn't pass, but it was there, and that tells you that there's some mentality that believes it should happen. And that's a great concern. We have, you know, I can tell you there's a school out in Peru where I went to high school, it was a boarding school, a Catholic boarding school. They have 20 or 30 little Chinese students. They're not good athletes. One or two of them would like to run track, or as you guys, I think you said, get out and just compete. Just get out and, you know, do the things, have the enjoyment. They're not allowed to because they're foreigners. They're legitimate students at a legitimate school here for legitimate academic reasons. They weren't recruited. SETA was not recruited for athletics. If you recall the testimony, I think Mr. Bresler said he was implied, at least he was marketing for athletic purposes. If you recall, Mr. Schmidt said he watched the film that he sent, and he laughed. He said, this is not an athlete. This is not a basketball player. It was pretty sad. Now, SETA may have believed he was a basketball player. He may have spied on people. But that has nothing to do with why he's here. Absolutely nothing. Do you like to wrap up, sir? I would ask the court not to succumb to what I think is this invading foreign kind of mentality. We have all these, this influx of foreign kids who are going to upset our competitive balance. There's absolutely no evidence whatsoever that that's happened, that it's happening. And because it hasn't happened, it isn't happening, there's no evidence it's likely to happen. I think it's just a shame that these kids come here. Again, they're legitimate students. Moussard is essentially a whore factory. It's for kids in very dire circumstances. And to me, it's the highest barriers on the part of the IHSA to say that these children are not deprived, that they shouldn't have all the benefits that a kid born in Cleveland would have if he wanted to go to school here. Thank you. Thank you. Mr. Brasler. Mr. Brasler, before you start, I want to ask you a question that may lead into what you've been talking about. In your brief, you say high school sports are best controlled and conducted fairly when students reside full-time with their parents and attend high schools in the district in which they reside with their parents. What if they have no parents? What if they don't have a guardian? What are they supposed to do? Your Honor, what I believe you're quoting from are the philosophies of the IHSA. Well, they were in your brief. No, but I'm just saying where that comes from. I mean, this is the philosophies underlying the IHSA that the membership has agreed to, and there's a couple of pages of them. It's not only what you said, but it's also things like academics should take priorities over athletics. I agree, but this is kind of the in-the-door. If they don't have parents, if they are orphaned, if they are homeless but their particular tent is in the district and their parents are in jail, they can't play? No, that's not what the rule says. That's absolutely not what the rule says. Well, they're not living with their parents. Under the circumstances that you gave, they absolutely were. Do they have a guardian? Maybe they don't. Maybe they don't. If they're from the United States, do they live in Mooseheart? They can play under the residential school exception. Again, these are exceptions to the general rules. That's what we're talking about. To the circumstance that you just gave me, they absolutely would be eligible. And so what's the difference? Again, you say between foreign students and a non-foreign student. The hypothetical student that you just gave me could attend a public school or a private school, including a Mooseheart. The foreign student cannot. They can only attend the Mooseheart-type school. So, again, referring back to the Griffin case, which recognizes the differences between the boundary schools and the non-boundary schools, and the IHSA's legitimate interest in leveling that competition and giving it discretion to do so, this is one of the means by which the IHSA has decided to do so. Now, one of the things that counsel argued is, well, they're not good athletes. Does this court really want the IHSA to determine eligibility based on how good an athlete is? You know, we don't like... Why do we want them to deny an entire group of kids coming over from other countries because some may be good athletes? Again, Your Honor, it has nothing to do with whether they're good or not. It has all to do with how do you level, how do you equalize the public schools and the private schools? And he's right. There is, you know, constant discussion between the public schools and the private schools. Well, if they're all horrible athletes, then what, I mean, how... You're actually, you're actually, then they're at a disadvantage. So maybe we should have some rules to try and propagate the private schools because all these kids come over are horrible athletes. Except, Your Honor, we know that's not the case. And unless you have some circumstance where there's some agency which says, we are going to randomly place these kids without, you know, to make sure that there's no influence in where these kids get placed, then you get three 7-foot kids going to one school. That's not a mistake. Do we want to invite an organization like AHOPE, African Hoop Opportunities, to make direct calls to a moose heart and say, hey, I got a couple more kids from this family. To me, I mean, apparently there wasn't a finding of recruitment, but to me, doesn't that smack of recruitment? You already have a rule against that. There was a finding of recruitment there, and Judge Aikman entered a temporary restraining order against it. Was it appealed? Did we say that? No. The board decided, the board of directors decided that in that instance the kids were taken advantage of because when those kids appeared before the board, they had no idea what they were getting into. They didn't know where they were going to school. They said, there's this organization, somebody saw them playing basketball. The next thing I know, I'm flying to O'Hare Airport, I get off a plane, and I'm taken to an AAU game. That seems like a balancing of the equities thing. Well, Your Honor. I'm just saying, as far as the finding of recruitment, you know, certainly seems reasonable in that circumstance. I don't disagree, Your Honor, but, you know, there were circumstances there and some sympathy for the kids in that situation. But, again, do we want to do that on an ad hoc basis, or do we want to say, how do we level this playing field between the private schools and the public schools in light of federal law which says these kids can't attend private schools, but they can't attend public schools? You want to rewrite federal law? Rewrite federal law. But we're stuck with it, and we're stuck trying to accommodate it. But if we don't even know how many students are involved, why can't we do it on an ad hoc basis? Well, we do know how many students are involved. There's 77,000 now versus 65,000 10 years ago. I asked how many are in Illinois, and you said we didn't know. No, because those kids are not eligible, and the only way that the IHSA would know is if there's an eligibility application. They don't apply for eligibility. And, you know, Mr. Counsel makes the assumption that all these kids are in boarding schools. There's no more in the record. You want to tell me there's 77,000 kids in boarding schools? He says you can't just go get a guardianship. Let me tell you, you can just go get a guardianship because I've seen it countless times. Well, I suppose if we had more time to talk about what happens in the Chicago public schools, maybe that's where we would find out some of these things. But the fact remains, he contacted somebody not in Chicago. He contacted somebody in Plano. And within a year of that contact, he is here and not eligible to play. It seems like there is a direct link, attack, whatever you want to call it, not on him but on Mooseheart, which is of concern. It is not a direct on Mooseheart per se. It is an attack, not attack. It is recognizing the advantage that a private school, and particularly a private school in Mooseheart's situation, which I will admit is somewhat unique, but where they can offer tuition, room and board, college scholarship. If I was an athlete from wherever, I'd love to go to a place like Mooseheart. If they're going to say, hey, you're going to either get a college scholarship or we're going to pay your college tuition, then I might be attracted to go there. We're both too old at this point, and my guess is neither one of us can jump high enough. And that's because they're poor, correct? Well, again, if you look at the fundamental documents of Mooseheart, it was to take in orphans. Mr. McKinley is not an orphan. He doesn't even meet the basic criteria for typical admission to Mooseheart. So every kid in Mooseheart, just so I understand, are orphans? Your Honor, I don't know that. I'm just looking at the documents which are posted on their website, which is a quote on our record. When they were developed back in the, what year was it? A long time ago. Yeah, the 1920s or 1800s. Yes. I think it was later than that. It was meant at that time for orphans of people being removed. And because of the fact that it is a residential school and that these kids live on campus, my guess is the broad majority of them are orphans still. But again, that's a criteria which doesn't seem to have applied here, because here you've got a student who has a family that, you know, they paid for his transportation here. I don't think that that fits the typical Mooseheart criteria. Anything further, Justice Hutchinson, Justice Berkley? Thank you. Thank you so much, gentlemen. Thank you so much for your time here today and your interesting arguments. We will take some time to take this case under consideration, and a decision will be rendered in due course. The court is adjourned for the day. Thank you.